# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00269-COA

**CARL BOYANTON, INDIVIDUALLY AND ON BEHALF OF FARMER FRESH PRODUCE, INC.**    APPELLANT

**v.**

**BROTHERS PRODUCE, INC. AND BRENT ERENWERT**    APPELLEES

DATE OF JUDGMENT:            12/28/2018
TRIAL JUDGE:                HON. CLAIBORNE McDONALD
COURT FROM WHICH APPEALED:  PEARL RIVER COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:     KRISTOPHER W. CARTER
ATTORNEYS FOR APPELLEES:    CHRISTOPHER HOWELL MURRAY
                            KRISTI ROGERS BROWN
NATURE OF THE CASE:         CIVIL - CONTRACT
DISPOSITION:                AFFIRMED IN PART; REVERSED AND
                            REMANDED IN PART - 09/01/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., WESTBROOKS AND LAWRENCE, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.    Carl Boyanton, on his behalf and on behalf of Farmer Fresh Produce Inc. (Boyanton),

sued Brent Erenwert, Brothers Produce Inc. (Brothers Produce), Michael Alise,[1] Christi

Alise, and Gulf Coast Produce Distributers Inc. (Gulf Coast Produce), claiming that the

parties had formed a joint venture pertaining to the storage, transport, supply, and distribution

of produce using a warehouse Boyanton owned in Picayune, Mississippi.  Boyanton alleged

contractual and negligence-based causes of action against the defendants.  The Pearl River

---

[1] Unless otherwise indicated, references to "Alise" below are to "Mike" Alise.

County Circuit Court granted summary judgment in the defendants' favor on all of Boyanton's claims against them and dismissed Boyanton's lawsuit with prejudice. Boyanton appeals. In the course of the appeal, the Alises and Gulf Coast Produce settled with Boyanton. The remaining appellees are Erenwert and Brothers Produce.

¶2. As addressed below, we find no error in the circuit court's decision to grant summary judgment in Erenwert and Brothers Produce's favor on Boyanton's claims for breach of contract based on the alleged joint venture, breach of contract based on the Picayune warehouse sublease and sub-sublease, promissory estoppel, negligent misrepresentation, and fraudulent misrepresentation. We therefore affirm the circuit court's summary judgment on these claims. Regarding Boyanton's equitable estoppel claim, we find no error in the circuit court's decision to grant summary judgment in Erenwert and Brothers Produce's favor on Boyanton's equitable estoppel claim relating to the alleged joint venture, and we therefore affirm the circuit court's summary judgment on this claim. However, based upon our review of the record, we find that a genuine issue of material fact exists with respect to Boyanton's equitable estoppel claim relating to the Picayune warehouse sublease and sub-sublease, and we therefore reverse the circuit court's decision to grant summary judgment in Erenwert and Brothers Produce's favor on this specific claim.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. In July 2016, Boyanton, on his behalf and on behalf of Farmer Fresh, sued Erenwert, Brothers Produce, the Alises, and Gulf Coast Produce based upon an alleged joint venture

2

that Boyanton claims was formed "among the parties" relating to the produce storage, transport, supply, and distribution out of a warehouse that Boyanton owned in Picayune, Mississippi. He alleged causes of action for "breach of contractual agreement(s) and detrimental reliance," negligent misrepresentation, tortious interference with prospective business relations, and promissory estoppel. He later also asserted claims for equitable estoppel and fraudulent misrepresentation. The Pearl River County Circuit Court granted summary judgment in the defendants' favor on all of these claims and dismissed Boyanton's lawsuit with prejudice.

¶4.     Boyanton appealed. During the course of this appeal, the appellees Mike Alise, Christi Alise, and Gulf Coast Produce were dismissed with prejudice based upon their representation that they "settled this matter" with Boyanton. Erenwert and Brothers Produce are the only appellees. We turn now to a discussion of the facts relating to this appeal.

¶5.     Boyanton was deposed in this matter in March 2017. He testified that he is the owner and president of Farmer Fresh, a company that at the time of his deposition was primarily in the produce brokering business. Boyanton and Farmer Fresh own a 100,000 square-foot warehouse in Picayune, Mississippi. In 2013, Boyanton sold the produce-distribution portion of Farmer Fresh's business to Andrew Mercier and Merchants Foodservice (an entity owned by Mercier). Boyanton retained the name Farmer Fresh. The ownership of the Picayune warehouse is subject to the terms of the 2013 purchase agreement with Mercier. Specifically, the warehouse is covered by a self-renewing twelve-month lease between Farmer Fresh and

3

another entity owned by Mercier. This lease contains a requirement that Mercier eventually purchase the warehouse. Farmer Fresh received $10,000 per month under this lease.

¶6.     Erenwert was deposed in this matter in May 2018. He testified that Brothers Produce is a produce distributer located in and doing business in Houston, Texas. During the relevant time period, Brothers Produce conducted most of its business in the surrounding Houston area and western Louisiana. At all times relevant to the underlying lawsuit, Erenwert was the president of Brothers Produce. As noted, Gulf Coast Produce and its principals, Mike and Christi Alise, were also defendants in the underlying lawsuit. Gulf Coast Produce is a produce distributor located in Biloxi, Mississippi, and provided services primarily in the south Mississippi and south Alabama areas during the relevant time period.

¶7.     The record reflects that in early 2015, Gulf Coast Produce and Brothers Produce saw a potential opportunity to grow their respective businesses into the Louisiana market. In order to explore this possibility, Mike Alise (for Gulf Coast Produce) and Erenwert (for Brothers Produce) had discussions to determine if the two companies could potentially "join forces" and compete for business in the New Orleans and Baton Rouge areas, particularly casino businesses in those markets. Erenwert testified that in discussing this idea, they talked about using the name "Gulf Coast Brothers" (a combination of both entities' names) for this project. Erenwert and Alise were both quoted in a March 2016 article in a trade publication, *The Packer*, about their plans to form Gulf Coast Brothers and operate out of "[a] 90,000-square-foot distribution facility in Picayune, Miss[issippi]."

4

¶8. As a result of these conversations between Gulf Coast Produce and Brothers Produce, Alise reached out to Boyanton in February of 2015 for his insights regarding the produce distribution market in Louisiana. Boyanton's company, Farmer Fresh, had been involved in the Louisiana markets before Boyanton sold the company in 2013.

¶9. According to Boyanton, after several conversations, Farmer Fresh (Boyanton), Gulf Coast Produce (Alise), and Brothers Produce (Erenwert) began discussing "the possibility of a joint venture." When asked to elaborate on the parties' discussions, Boyanton said that they "discuss[ed] the potential of us putting together a joint venture to take and get all the business in Louisiana." Boyanton could not state with specificity when the discussions with Alise and Erenwert reached the point where there was an alleged agreement, but he thought it occurred in the middle of 2015.

¶10. Boyanton admitted that there was never any written memorialization of any agreement other than what may appear in text messages or emails. Regarding Erenwert, specifically, Boyanton testified that there was only one text exchange between him and Erenwert because "[he] talked to [Erenwert] in person." Boyanton also testified that Erenwert "flew in anywhere from four to six times to see [Boyanton and Alise] and sit down and talk about it."

¶11. In his deposition, Boyanton described the proposed business plan as follows:

> They were going to lease out a third of the building [(Boyanton's Picayune warehouse)], which is all refrigerated with a refrigerated dock, and they were going to just open up Gulf Coast Brothers to go out and get the Louisiana business, casino business, and all the Produce Alliance business, the NPC business, the Fresh Concepts business, C.H. Robinson business, Fresh Works business. Those are all buying groups which I left open when I sold the

5

business[.]

Boyanton clarified that by "they" he meant Alise/Gulf Coast Produce and Erenwert/Brothers Produce who, as he testified, "were going to just open up Gulf Coast Brothers to go out and get the Louisiana business. . . ." Boyanton also described potential plans for "a consolidation for the distribution warehouse" and a "tomato repack[ing] facility" involving his entities, Farmer Fresh Produce and Farmer Fresh Cuts.

¶12. Boyanton confirmed that he would not have any partnership or ownership interest in Gulf Coast Brothers. Boyanton's role would be as "a vendor for Gulf Coast Brothers for product." He would not be involved in the day-to-day-management in running Gulf Coast Brothers' business, but rather he "would have been helping them do their purchasing and their sales in the area because of the connections [he] had." The record reflects that according to Boyanton, the parties to the "venture" that was the subject of the lawsuit were Farmer Fresh Produce and Farmer Fresh Cuts (both owned by Boyanton) and Gulf Coast Brothers.

¶13. Boyanton was asked in his deposition about any discussions among the parties about sharing profits. He responded with respect to both profits and expenses, as follows: "Well, the typical way was going to be a third, a third, and a third . . . we were going to split it, the expenses and the profits." Boyanton later clarified in his deposition, however, that "[they] never discussed everything [one hundred] percent specific to what we were doing. Whether it was, you know, my day-to-day being there or anything." Boyanton confirmed there was

6

not a written business plan where expenses and expected profits were broken down.

¶14. Regarding Boyanton's Picayune warehouse, the record reflects that Merchants Foodservice (a Mercier entity) had stopped operating from that location in mid-2014, about one year to eighteen months after it purchased the distribution portion of Farmer Fresh and entered into the lease-purchase agreement with Boyanton for the warehouse. With respect to the "venture," Boyanton said that he, Alise, and Erenwert discussed Gulf Coast Brothers' leasing of one-third of the building and that he (Boyanton) planned to move his south Alabama processing plant to use the remaining two-thirds of the warehouse "to support the distribution center they were putting in." Boyanton testified that he told Alise and Erenwert that he could probably "get this warehouse back if you guys want to go in and put this venture together. So, that's when they said, well, yeah, if we can get the lease done up, let's go ahead and get it started. So I spent, like, six months negotiating the lease." Boyanton confirmed that Alise and Erenwert were not involved in the negotiations with Mercier and that they made no demands regarding the terms of the lease. Boyanton testified that "[t]hey knew the terms I was negotiating. I gave them what the parameters were I was negotiating and what our cost was, and they were on board with it. So they let me take and negotiate the lease."

¶15. In mid-January, effective January 1, 2016, Carl and Heidi Boyanton and Sunrise Fresh Produce LLC (a Mercier entity) entered into a "Commercial Sub-Lease Agreement" for the Picayune warehouse. Neither Brothers Produce, Erenwert, Gulf Coast Produce, nor the

7

Alises are on the sublease. Gulf Coast Brothers is also not on the sublease.

¶16. Boyanton testified that before he signed the sublease, "he [sent a text to] Mike Alise [that] said, I've got the lease, we're signing tomorrow. Everything good to go? He [Alise] said, yes, we're all on board, which will be in [the] texts [messages]." The text message in the record on this exchange between Boyanton and Alise, however, simply states:

[Boyanton:] Signing lease today[.]

[Alise:] Please email me a copy[.]

There was no mention of Erenwert in that exchange. Boyanton was asked whether "there was a phone call that went along with those text messages." He responded, "No. That was just the day of the lease. I wanted to make sure they were still on board before I signed it." The record reflects that Boyanton emailed a copy of the sublease between Boyanton and Sunrise (the Mercier entity) to Alise. Erenwert was not copied on this email. Alise responded, "Ok thanks," and copied Erenwert on his response.

¶17. Boyanton was specifically questioned about whether he had any communication with Erenwert on the day he signed the sublease with Sunrise. Boyanton testified that he did not but that a few weeks earlier, Erenwert was at the warehouse, and they "discussed the lease . . .[,] and he was on board."

¶18. Farmer Fresh closed its south Alabama processing plant in November 2015 and moved it to the Picayune warehouse in January 2016.

¶19. Regarding discussion about a sub-sublease on the warehouse, Boyanton testified that

8

he was subleasing two-thirds of the warehouse for the Farmer Fresh and Farmer Fresh Cut operations, with Gulf Coast Produce and Brothers Produce to lease the remaining one-third of the warehouse. He sent copies of this "sub-sublease" to Alise and Erenwert. No version of the sub-sublease agreement in the record has any mention of Brent Erenwert or Brothers Produce. The lessor on the sub-sublease is Farmer Fresh Produce, and the lessee is "Gulf Coast Brothers Produce LLC." The signatory for Gulf Coast Brothers Produce is "Mike Alise, Manager." The sub-sublease was never executed.

¶20. In mid-July, 2016, Gulf Coast Produce's then-employee Don Governale informed Boyanton that Gulf Coast Produce and Brothers Produce were going to go in a different direction and were not interested in leasing the warehouse.

¶21. The record reflects that Mike Alise applied for an Employer Identification Number (EIN) for Gulf Coast Brothers. Erenwert testified that he did not know that Alise did so until after he received the filed application. Erenwert further testified that he would not have had Alise apply for it if he had known he was going to do it. The record also reflects that Gulf Coast Brothers LLC has never been registered with the Mississippi Secretary of State and is not a valid entity.

¶22. With respect to the time period from January 2016 (when Boyanton signed the sublease with Sunrise Fresh) to July 2016 (when Governale told Boyanton that Alise and Erenwert were not interested in further discussion or leasing the warehouse), Boyanton testified that Erenwert and Alise continued to push back the effective date for the sub-

9

sublease. During this time, according to Boyanton, Alise was in Boyanton's office on virtually a weekly basis, continuing to express his continued involvement in (and excitement about) the venture. Boyanton testified that offices in the warehouse were remodeled specifically for Alise. Gulf Coast Produce had internet and phone installed in Gulf Coast Produce's name at the Picayune warehouse, and began paying for it. There is no evidence that any of these actions were taken by Erenwert or by anyone on Brothers Produce's behalf. Regarding Erenwert, Boyanton testified that in late June or early July 2016, he said to Erenwert, "[L]ook, you know, what's going on, when are we going to get this thing started[?] He [(Erenwert)] said, well, I'm waiting for Mike [(Alise)] to get the numbers, that's all I'm waiting for and we're good to go."

¶23. As noted above, Boyanton sued Erenwert, Brothers Produce, the Alises, and Gulf Coast Produce in July 2016, claiming there were "agreements, investments[,] and planned joint business ventures between the parties pertaining to the storage, transport, supply[,] and distribution of produce (and related activities and enterprises)." Boyanton alleged causes of action for "breach of contractual agreement(s) and detrimental reliance," negligent misrepresentation, tortious interference with prospective business relations, and promissory estoppel.

¶24. After discovery had taken place, Erenwert and Brothers Produce moved for summary judgment on all of Boyanton's claims. The Alises and Gulf Coast Produce also separately moved for summary judgment on of all Boyanton's claims. In response, Boyanton addressed

10

the claims he raised in his complaint and also raised arguments allegedly in support of an equitable estoppel claim and a claim for fraudulent misrepresentation. After a joint hearing on both motions, the circuit court granted the defendants' motions for summary judgment by separate orders entered on December 20, 2018. On December 28, 2018, the circuit court entered its "Final Judgment of Dismissal with Prejudice," dismissing Boyanton's claims, including the claims for equitable estoppel and fraudulent misrepresentation that Boyanton addressed in his responses to the defendants' summary judgment motions.

¶25. Boyanton appeals, generally asserting that the circuit court erred in granting summary judgment on his claims because there exists genuine issues of material facts exist on these claims. However, in his appellate brief, Boyanton does not address in any way his claim for tortious interference with prospective business relations or his claim for punitive damages, which were claims he made in his underlying lawsuit. These claims, therefore, have been waived on appeal. *Holman v. Howard Wilson Chrysler Jeep Inc*., 972 So. 2d 564, 566 n.1 (Miss. 2008). We combine Boyanton's remaining claims as follows: breach of contract based on the alleged joint venture; breach of contract based on the Picayune warehouse sublease and sub-sublease; equitable estoppel and promissory estoppel;[2] and negligent misrepresentation and fraudulent misrepresentation.

---

[2] In his complaint, Boyanton asserted a combined breach of contract/detrimental reliance claim. Detrimental reliance is not a separate claim under Mississippi law but rather is "an element of estoppel," *Noble v. Wellington Assocs. Inc*., 145 So. 3d 714, 721 n.3 (Miss. Ct. App. 2013), and therefore we discuss it in relation to Boyanton's equitable and promissory estoppel claims. *Id.* at (¶34).

11

**STANDARD OF REVIEW**

¶26.    An appeal from summary judgment is reviewed de novo, and we view the evidence in the light most favorable to the non-moving party. *Mayer v. Angus*, 83 So. 3d 444, 448 (¶9) (Miss. Ct. App. 2012).  As set forth in Mississippi Rule of Civil Procedure 56, "[t]he judgment sought shall be rendered . . . if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c).  The non-movant "carries the burden of producing sufficient evidence of the essential elements of his claim at the summary-judgment stage, [just] as he would carry the burden of production at trial." *Karpinsky v. Am. Nat'l Ins. Co.*, 109 So. 3d 84, 89 (¶13) (Miss. 2013).  "The party opposing the motion 'may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" *Mayer*, 83 So. 3d at 448 (¶9) (quoting M.R.C.P. 56(e)).  "The non-moving party's claim must be supported by more than a mere scintilla of colorable evidence; it must be evidence upon which a fair-minded jury could return a favorable verdict." *Wilbourn v. Stennett, Wilkinson & Ward*, 687 So. 2d 1205, 1214 (Miss. 1996); *see also Rowan v. Kia Motors Am. Inc.*, 16 So. 3d 62, 66 (¶12) (Miss. Ct. App. 2009).

**DISCUSSION**

I.      **Breach of Contract Based on the Alleged Joint Venture**

¶27. Boyanton asserts that there exists genuine issues of material fact whether "[t]he parties were involved in an ongoing venture" and whether, by failing to continue that venture, Erenwert, Brothers Produce, the Alises, and Gulf Coast Produce breached a "legal obligation [to it], regardless of the existence of a written contract." Based upon our review of the record, we agree with the circuit court that summary judgment in Erenwert and Brothers Produce's favor is warranted on this issue.

¶28. As the Mississippi Supreme Court recognized in *Hults v. Tillman*, 480 So. 2d 1134, 1143 (Miss. 1985), "[a] joint venture is a form of contract and governed by contract law." In this regard, "[t]he elements of a valid contract are: (1) two or more contracting parties, (2) consideration, (3) an agreement that is sufficiently definite, (4) parties with legal capacity to make a contract, (5) mutual assent, and (6) no legal prohibition precluding contract formation." *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (¶13) (Miss. 2003).

¶29. Specifically with respect to the formation of a joint venture, such an entity "exists when two or more persons combine in a joint business enterprise for their mutual benefit with an understanding that they are to share in profits or losses and each to have a voice in its management." *Pittman v. Weber Energy Corp.*, 790 So. 2d 823, 826 (¶10) (Miss. 2001) (citation omitted). To form a joint venture, "there must be a joint proprietary interest and right of mutual control." *Adams v. Hughes*, 191 So. 3d 1236, 1242 (¶16) (Miss. 2016). In examining these factors, "actual intent to form a joint venture is essential." *Hults*, 480 So. 2d at 1143. "What is essential to any intent to form a joint venture is the idea that the parties

13

are engaging in the undertaking with both parties owning the venture, with a right of mutual control, and joint obligations and liabilities." *Id.* at 1146. We now apply these principles to the facts, viewed in the light most favorable to Boyanton, and bearing in mind that Boyanton has the burden of presenting sufficient evidence to overcome summary judgment as to each element of his joint venture claim. *Wilbourn*, 687 So. 2d at 1213-14 (Miss. 1996).

¶30. Boyanton asserts that the "venture" forming the crux of his lawsuit was among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers (a proposed joint venture between Gulf Coast Produce and Brothers Produce that Erenwert and Alise discussed forming). For discussion purposes, we will refer to this purported joint venture as the "Picayune joint venture"—however, we specifically note that the record does not contain any evidence that the parties discussed a name for the alleged joint venture among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers, nor does our review of the record reveal any evidence of discussions among the parties of any management structure or "mutual control" of *that* joint venture.

¶31. For example, the record contains text messages sent in mid-April 2016 between Boyanton and Alise where Alise tells Boyanton that he and Erenwert were "in the hunt" for a general manager and asks Boyanton to let him know if he thinks of anyone. Boyanton confirmed in his deposition that these text messages were about a general manager for *Gulf Coast Brothers'* portion of the warehouse, who would not have anything to do with the Farmer Fresh operations and would not work for Boyanton. The record does not contain any

14

evidence that similar discussions or communications took place among any of the parties about a proposed general manager or any management structure of the purported Picayune joint venture. Further, although the record contains evidence of the proposed ownership and management of Gulf Coast Brothers (the proposed joint venture between Gulf Coast Produce and Brothers Produce), Boyanton confirmed in his deposition that he would not have any partnership or ownership interest in Gulf Coast Brothers, nor would he be involved in the day-to-day-management in running Gulf Coast Brothers' business. Boyanton's role was as "a vendor for Gulf Coast Brothers for product." We find that these factors demonstrate a lack of intent among the parties to form the Picayune joint venture.

¶32. Boyanton also asserts that Alise and Erenwert asked Boyanton to negotiate the warehouse sublease with Mercier "in support of the Picayune joint venture." Boyanton further asserts that he kept Alise and Erenwert updated on the status of these negotiations that he entered into about the sublease on behalf of "the venture." But the sublease, on its face, is only between Sunrise Fresh Produce LLC (a Mercier entity) (Lessor) and Heidi and Carl Boyanton (Lessee[s]). Neither Gulf Coast Brothers, nor Brothers Produce, Erenwert, Gulf Coast Produce, or the Alises were on the sublease. There is no explanation in the record for why Carl Boyanton and Heidi Boyanton, individually, signed the sublease as "Lessee[s]" if the parties intended that Boyanton enter the sublease "on behalf of the venture." We do not find that the sublease evidences that Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers intended to operate as a joint venture.

15

¶33.   Regarding the draft of the sub-sublease that Boyanton sent to Alise, who forwarded it to Erenwert, that lease is between Farmer Fresh Produce (Lessor) and "Gulf Coast Brothers Produce LLC" (Lessee), and the signatory for "Gulf Coast Brothers Produce LLC" is "Mike Alise, Manager."  The only remaining appellees, Erenwert and Brothers Produce, are not mentioned anywhere in the sub-sublease.  We do not find that this indicates that Erenwert or Brothers Produce intended to operate as part of a joint venture with Boyanton or his entities.

¶34.   Boyanton also relies on an article published in a trade publication, *The Packer*, on March 18, 2016, quoting Erenwert and Alise, as evidence of the Picayune joint venture.  The article states that "Produce Brothers Inc. [sic] and Gulf Coast Produce Distributors Inc. . . . later this spring plan to open Gulf Coast Brothers Produce in [a] 90,000-square-foot distribution facility in Picayune, Miss[issippi]."  On its face, the article is describing the proposed joint venture between Gulf Coast Produce and Brothers Produce—there is no mention anywhere in the article of any other venture with any other entity.  In particular, there is no mention of Boyanton or any of his entities.  Regarding the reference to the Picayune warehouse, we find that although this reference may indicate that Gulf Coast Brothers proposed to operate out of the Picayune warehouse, this is not evidence that Gulf Coast Brothers intended to operate as part of a joint venture with Boyanton or his entities.

¶35.   Regarding the discussion of profits, Boyanton asserts that the parties discussed that they would allocate profits and expenses by thirds among Farmer Fresh Cuts, Farmer Fresh,

16

and Gulf Coast Brothers. After describing numerous buying groups that the Picayune joint venture planned to potentially target, as well as potential plans for a distribution warehouse and a tomato repacking facility that the Picayune joint venture proposed to undertake, Boyanton was asked about any discussions about profit allocation. He responded, "Well, *the typical way* was going to be a third, a third, and a third . . . we were going to split it, the expenses[3] and the profits." (Emphasis added).

¶36. Later in his deposition Boyanton was asked whether there was any agreement among the parties as to purchases of specific equipment, for example. Boyanton said, "[w]e never discussed specifics, like, you know, I'm gonna go buy a forklift. . . ." Particularly relevant is that Boyanton also testified: "*We never discussed everything [one hundred] percent specific to what we were doing. Whether it was, you know, my day-to-day being there or anything.*" Boyanton was also asked whether "there ever any kind of written business plan where you broke down, hey, this is what we think the expenses are going to be, this is what we think we're going to make in profit?" Boyanton responded, "No." We do not find that Boyanton's general testimony that "the typical way" profits and expenses would be allocated

---

[3] The record also contains a few text messages between Alise and Boyanton about allocating expenses by thirds for an initial pest control extermination for the warehouse and a food audit. Erenwert was not on these text messages, and the record reflects that no food audit was done for the Picayune warehouse. Additionally, the record contains an email dated January 14, 2016, from Boyanton to Alise sending a draft of the sublease and providing that "[t]his lease will be divided 3 ways . . . ." Erenwert was not copied on this email. Alise replied, "[O]k thanks," and copied Erenwert on his reply. There is no response from Erenwert. We do not find that this exchange indicates that Erenwert intended that Gulf Coast Brothers would operate as part of a joint venture with Boyanton or his entities.

by thirds supports his assertion that the parties intended to form the Picayune joint venture, particularly in the light of his other testimony acknowledging that no specifics had been discussed. *See Hults*, 480 So. 2d at 1143 ("[A]n agreement to share in profits and losses is not alone sufficient; there must be, in addition, an intention of the parties to be associated together as general partners, or for the more limited duration of a joint venture.").

¶37. Additionally, Boyanton asserts that he moved his south Alabama processing plant to the Picayune warehouse "to support the venture." The record reflects, however, that Boyanton closed that plant in November 2015—and Boyanton testified that as of late December 2015 "there wouldn't have been a firm plan [on how Gulf Coast Brothers] would operate until we actually put it all together." Thus, even a month after he closed the south Alabama processing plant, Boyanton acknowledged that the parties had not yet "actually put [the Picayune joint venture] all together."

¶38. Further indicating the lack of mutual intent among the parties to form the Picayune venture is that Gulf Coast Brothers never became a legal entity, and the record contains text messages between Alise and Erenwert indicating that they were still searching for investors in late April 2016. Boyanton asserts that the application Alise filed for an EIN for Gulf Coast Brothers supports his Picayune joint-venture argument, but we do not find that this is evidence of any intent on Erenwert or Brothers Produce's part to form the Picayune joint venture. The record reflects that the EIN application was filed by Mike Alise. Erenwert testified that he did not know that Alise applied for the EIN until he received the notice. He

18

further testified that had he known that it was being done, he would not have had Alise do so.

¶39. Finally, Boyanton asserts that after he signed the sublease in January 2016, *Alise* was in his office on virtually a weekly basis expressing excitement about the project and that offices in the Picayune warehouse were remodeled *for Alise*. As for the remaining appellees, Erenwert and Brothers Produce, however, there is no testimony or evidence in the record that any similar action was taken by Erenwert or done at his request. The record also reflects that *Gulf Coast Produce* had internet and phone connections installed in its own name at the Picayune warehouse. Boyanton testified that Erenwert had "nothing to do with [this installation]."

¶40. Regarding communications with Erenwert, we recognize that Boyanton testified that in late June or early July 2016, Boyanton asked him, "[W]hat's going on, when are we going to get this thing started[?]" According to Boyanton, Erenwert replied, "[W]ell, I'm waiting for Mike [Alise] to get the numbers, that's all I'm waiting for and we're good to go." Given the lack of evidence with respect to the essential factors necessary to constitute a joint venture discussed above, we do not find that the vague statement "we're good to go" constitutes sufficient proof to create a genuine issue of material fact that Erenwert or Brothers Produce intended to operate as a joint venture with Boyanton or his Farmer Fresh entities. *See Wilbourn*, 687 So. 2d at 1214 (recognizing that the non-movant's "claim must be supported by more than a mere scintilla of colorable evidence").

19

¶41. As we have stated above, the formation of a contract requires, among other factors, that the purported agreement be "sufficiently definite" and that there is "mutual assent" among the parties. *Rotenberry*, 864 So. 2d at 270 (¶13). Stated specifically in terms of a joint venture, "actual intent to form a joint venture is essential." *Hults*, 480 So. 2d at 1143; *Roffman v. Wilson*, 914 So. 2d 279, 282 (¶8) (Miss. Ct. App. 2005) ("There must be an intent of the parties to be associated together."). Based upon our review of the record and the applicable law, we find that Boyanton has failed to present sufficient evidence to create a genuine issue of material fact on these essential elements of his joint venture claim against Erenwert and Brothers Produce. We therefore affirm the circuit court's decision to grant summary judgment in favor of Erenwert and Brothers Produce on this claim.[4]

## II. Breach of Contract Based on the Picayune Warehouse Sublease and Sub-sublease

¶42. Boyanton asserts that a genuine issues of material fact exists as to whether there was an agreement among "the parties" to "split the costs of the sublease," regardless of a written

---

[4] Because we find that Boyanton has failed to present sufficient evidence to survive summary judgment with respect to the existence of a joint venture among Farmer Fresh Cuts, Farmer Fresh (Boyanton), and Gulf Coast Brothers, we need not address Boyanton's alleged damages in the form of "lost future profits" of the purported Picayune joint venture. In any event, we also observe that although Boyanton asserts "it is not proper to adjudicate [damages] claims on summary judgment," Boyanton fails to cite any authority supporting this proposition with respect to his alleged lost future profits. As the Mississippi Supreme Court held in *Tupelo Redevelopment Agency v. Gray Corp.*, 972 So. 2d 495, 514 (¶52) (Miss. 2007), the "[f]ailure to cite any authority in support of claims of error precludes this Court from considering the specific claim on appeal." We find that the same principle applies in this case.

20

contract. We find this contention without merit as to Erenwert and Brothers Produce. The sublease is only between Sunrise Fresh Produce LLC (a Mercier entity) (Lessor) and Heidi and Carl Boyanton (Lessee[s])—there is no mention anywhere in the document of Gulf Coast Brothers or any defendant Boyanton named in his lawsuit (Erenwert, Brothers Produce, the Alises, or Gulf Coast Produce).

¶43. Further, although Boyanton testified that he sent a text message to Alise on the day he was planning to sign the sublease to confirm that "everything was good to go," Boyanton also testified that he had *no* communications with Erenwert that day. Instead, Boyanton testified that he merely "discussed the lease" with Erenwert a few weeks earlier when negotiations were still ongoing, as follows:

[COUNSEL FOR BROTHERS:]   And you said you had a text exchange with Mike Alise. Did you also have one with Brent Erenwert?

[BOYANTON:]   No.

[COUNSEL FOR BROTHERS:]   Did you have a phone conversation with Brent Erenwert regarding that?

[BOYANTON:]   Well, a few weeks earlier he had flown in with his dad and [Don] Governale and that's when we discussed the lease with him, and he was on board.

. . . .

[COUNSEL FOR BROTHERS:]   In that conversation, you're still negotiating the sublease agreement, correct?

21

[BOYANTON:] Right.

Boyanton testified that other than the four or so face-to-face meetings when Erenwert was present, "all the other discussion[s]" were with Alise. He testified that he was "assuming" that Mike was talking to Erenwert, and he "would assume . . . [Erenwert] probably looked at the lease." We do not find that these assumptions constitute evidence of any promise or "mutual assent" on Erenwert or Brothers Produce's part to "split the costs of the sublease." *See Rotenberry*, 864 So. 2d at 270 (¶13) (explaining that "mutual assent" is an essential element of a valid contract).

¶44. To the extent Boyanton is attempting to rely on the sub-sublease for one-third of the Picayune warehouse as evidence of an agreement to "split the costs of the sublease," the record reflects that the draft sub-sublease between Boyanton and Gulf Coast Brothers was for a five-year term. Accordingly, any attempt to enforce such an obligation is barred by the Mississippi statute of frauds, Mississippi Code Annotated section 15-3-1 (Rev. 2012), as follows:

> An action shall not be brought whereby to charge a defendant or other party . . . upon any contract for the sale of lands . . . *or the making of any lease thereof for a longer term than one year* . . . . unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing.

(Emphasis added). In any event, the sub-sublease is between Farmer Fresh Produce (Lessor) and "Gulf Coast Brothers Produce LLC" (Lessee). The signatory for "Gulf Coast Brothers

22

Produce LLC" is "Mike Alise, Manager." Neither Erenwert nor Brothers Produce (the only remaining appellees) are mentioned anywhere in the sub-sublease, and the sub-sublease is not executed on "Gulf Coast Brothers Produce LLC's" behalf. We find that Boyanton has failed to show that any genuine issue of material fact exists with respect to his breach of contract claim relating to the sublease or sub-sublease as against Erenwert and Brothers Produce. Accordingly, we find no error in the circuit court's decision granting summary judgment in Erenwert and Brothers Produce's favor on this issue, and we affirm this decision.

### III.    Equitable Estoppel and Promissory Estoppel

¶45.    Boyanton asserts that the circuit court erred when it failed to recognize the existence of genuine issues of material fact with respect to his equitable and promissory estoppel claims. We now address these claims with respect to Erenwert's actions in this case.

### A.    Equitable Estoppel

¶46.    As an initial matter, we recognize that Boyanton did not specifically raise a claim of "equitable estoppel" in his complaint. However, Boyanton did allege facts in his complaint that he claimed supported his "detrimental reliance" on the defendants' actions. As we have noted above, "[d]etrimental reliance . . . is an element of both promissory estoppel and equitable estoppel." *Weible v. Univ. of S. Miss*., 89 So. 3d 51, 67 (¶52) (Miss. Ct. App. 2011). The issue then becomes whether Boyanton raised this claim before the circuit court in connection with defendants' summary judgment motions. We find, as the circuit court

23

found, that Boyanton did so. Specifically, Boyanton raised an equitable estoppel claim in his responses to the defendants' motions for summary judgment, without objection. Erenwert and Brothers Produce addressed this claim in their reply brief. Further, the circuit court addressed this claim in its judgment, finding that this principle did not apply in this case. Accordingly, we address Boyanton's equitable estoppel claim on appeal. *See* M.R.C.P. 15(b) ("When issues not raised by the pleadings are tried by expressed or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."). *Jones v. Fluor Daniel Servs. Corp.*, 32 So. 3d 417, 428-29 (¶54) (Miss. 2010) ("Under [Rule] 15(b), a complaint is amended to add a claim by implied consent of the parties, if the plaintiff raises the claim in response to a motion for summary judgment, and the trial judge decides the issue on summary judgment without an objection from the defendant.").

¶47.    "A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct." *Turner v. Terry*, 799 So. 2d 25, 37 (¶42) (Miss. 2001).  The party's reliance on the actions of another must be reasonable. *Trosclair v. Miss. Dep't of Transp.*, 757 So. 2d 178, 181 (¶13) (Miss. 2000).

¶48.    Boyanton generally asserts that there exist genuine issues of material fact with respect to his equitable estoppel claim. To the extent Boyanton asserts that he reasonably relied on Erenwert's conduct in believing that the Picayune joint venture existed among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers, we find Boyanton's assertion without merit.

24

Based upon our review of the record, we find no genuine issue of material fact on this issue. We find that the evidence and testimony we have discussed above in connection with Boyanton's alleged Picayune joint venture claim demonstrates that there was simply no conduct or communication on Erenwert's part that Boyanton could have reasonably relied upon in believing that the Picayune venture existed among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers. We therefore affirm the circuit court's grant of summary judgment in Erenwert and Brothers Produce's favor on the joint-venture equitable estoppel issue.

¶49. As to entering into the sublease, Boyanton asserts that the "[d]efendants should be estopped from escaping the financial commitment of the sublease, even though they did not sign it." Based upon our review of the record, we find that genuine issues of material fact *do* exist with respect to this particular issue. Boyanton testified that Erenwert and Alise directed him to negotiate the lease and that he kept them updated on the status of the negotiations. Additionally, Boyanton testified that about three weeks before he signed the sublease with Sunrise Fresh (Mercier), Erenwert was at the warehouse on a visit with his father and Don Governale and that they discussed the lease. According to Boyanton, Erenwert said that "he was on board." Additionally, even after he signed the sublease in January 2016, we find that genuine issues of material fact exist regarding whether Boyanton reasonably relied on Erenwert's conduct in believing that at some point Gulf Coast Brothers would execute the sub-sublease on one-third of the Picayune warehouse. Such evidence includes, for example, Boyanton's testimony that as late as June or early July 2016,

25

Boyanton asked Erenwert, "[W]hat's going on, when are we going to get this thing started[?]" According to Boyanton, Erenwert replied, "[W]ell, I'm waiting for Mike [(Alise)] to get the numbers, that's all I'm waiting for and we're good to go." There is at least an inference in Erenwert's response that he meant that they were "good to go [forward]" with executing the sub-sublease.

¶50. We find that this evidence, viewed in the light most favorable to Boyanton, is sufficient to create a genuine issue of material fact as to whether Boyanton reasonably relied on Erenwert's actions in entering the sublease with the expectation that Gulf Coast Brothers would sublease one-third of the warehouse. As this Court recognized in *Beasley v. Sutton*, 192 So. 3d 325, 334 (¶28) (Miss. Ct. App. 2015), "[a] promise is not required for [an equitable estoppel] claim—the inducement may originate from words or conduct upon which the person relied and then changed [his] position." Continuing, this Court found that "the test is whether it would be substantially unfair to allow a person to deny what he has previously induced another to believe and take action on." *Id.* (internal quotation marks omitted).

¶51. Erenwert asserts, and the circuit court found, that testimony from Mercier and emails between Boyanton and Mercier demonstrate that Boyanton entered the sublease with the Mercier entity to pay Mercier "for improving the Picayune warehouse" and that Boyanton would have sublet the warehouse from Mercier whether or not he had additional tenants. However, Boyanton explained in his deposition that although he told Mercier while

26

negotiating the sublease that he was doing it "to help [Mercier] recoup some of his costs," he did this in order to "leverage the deal," so that he (Boyanton) "could get the lease on the warehouse for [the Picayune venture]."

¶52.    We find that this evidence does not support summary judgment on the sublease equitable estoppel issue.  Instead, we find that such evidence is further support for our determination that a genuine issue of material fact exists with respect to this particular claim. *See Trosclair*, 757 So. 2d at 181 (¶13) ("Concerning the application of equitable estoppel, the issue becomes a question for the trier of fact when there is evidence to support a finding that the plaintiff reasonably relied on the actions of the defendant to his detriment." (internal quotation mark omitted)).  Accordingly, because we find that a genuine issue of material fact exists with respect to Boyanton's sublease equitable estoppel claim, we reverse the circuit court's decision to grant summary judgment in Erenwert and Brothers Produce's favor on this particular issue.

### B.    Promissory Estoppel

¶53.    In *Beasley*, 192 So. 3d at 335 (¶33), this Court set forth the elements of promissory estoppel, as follows: "(1) the making of a promise, even though without consideration, (2) the intention that the promise be relied upon and in fact is relied upon, and (3) a refusal to enforce it would virtually sanction the perpetuation of fraud or would result in other injustice."  The "promise" must be "explicit," it cannot be "merely implied by various comments and actions made by [the alleged promissor]." *Id.* at (¶34).

27

¶54. Boyanton asserts that there exists genuine issues of material fact regarding his promissory estoppel claim. Based upon our review of the record, and for the same reasons discussed above regarding Boyanton's Picayune joint venture claim, we find no evidence at all of any express or explicit promise made by Erenwert, individually, or on Brothers Produce's behalf regarding the formation or continuation of a joint venture among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers. We likewise find that Boyanton has failed to produce any evidence sufficient to create a jury question on whether Erenwert is estopped from avoiding alleged obligations under the sublease under a promissory estoppel theory. Based upon our review of the record, and as we have discussed above, we find no evidence that Erenwert made an express or explicit promise to Boyanton that he or Brothers Produce would incur any obligation on the sublease between the Boyantons and Sunrise Fresh, or on the unexecuted sub-sublease between Farmer Fresh Produce (Lessor) and Gulf Coast Brothers Produce LLC (Lessee). *See Beasley*, 192 So. 3d at 335 (¶34) (finding summary judgment was proper on plaintiff's promissory estoppel claim where the record lacked any evidence of an explicit promise to pay alleged amount owed). We therefore affirm the circuit court's decision granting summary judgment in Erenwert and Brothers Produce's favor on Boyanton's promissory estoppel claim.

## IV.    Negligent Misrepresentation and Fraudulent Misrepresentation

¶55. Boyanton asserts that genuine issues of material fact exist with respect to his negligent and fraudulent misrepresentation claims. We address both claims below.

28

### A. Negligent Misrepresentation

¶56. To avoid summary judgment on his negligent misrepresentation claim, Boyanton must demonstrate the existence of a genuine issue of material fact as to each of the following five elements of this claim:

> (1) a misrepresentation or omission of a fact; (2) that the representation or omission is material or significant; (3) that the person charged with the negligence failed to exercise that degree of diligence and expertise the public is entitled to expect of such persons; (4) that [Boyanton] reasonably relied upon the . . . misrepresentation or omission; [and] (5) that [Boyanton] suffered damages as a direct and proximate result of such reasonable reliance.

*Spragins v. Sunburst Bank*, 605 So. 2d 777, 780 (Miss. 1992). Regarding the first element, the misrepresentation of a fact, that fact "must concern a past or present fact as contrasted with a promise of future conduct." *Id.*

¶57. In support of his alleged Picayune joint venture "misrepresentation" assertions, Boyanton relies on the same evidence and testimony we have discussed above in connection with Boyanton's alleged Picayune joint venture claim. For the same reasons we found that this information did not demonstrate the requisite "intent" element of Boyanton's Picayune joint venture claim, we also find that it does not demonstrate that any conduct or communication on Erenwert's part constituted a "misrepresentation or omission of a fact" that Boyanton could have reasonably relied upon in believing that the Picayune joint venture existed among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers.

¶58. Indeed, when asked about these alleged misrepresentations, Boyanton testified as follows:

| [COUNSEL FOR ERENWERT:] | What did [the Defendants] misrepresent to you? . . . |
|---|---|
| [BOYANTON:] | Well, because they pulled out of our joint venture. They misrepresented that they were going to come in and we were gonna do all this business together, which it spells it out in the articles exactly what their portion was going to be. My portion was going to feed off of that. I would have made money working with them, and they would have made money working with me. |

Boyanton's own description of the alleged "misrepresentations" about the Picayune joint venture shows that these statements related to *future* plans and conduct, which do not give rise to an actionable negligent misrepresentation claim. *Spragins*, 605 So. 2d at 780; *Bank of Shaw v. Posey*, 573 So. 2d 1355, 1360 (Miss. 1990).

¶59. Regarding his sublease-negligent-misrepresentation claim, Boyanton asserts that his "actions were objectively reasonable in signing the sublease, and there is no doubt that he relied to his detriment upon Defendants' negligent (and fraudulent) representations and omissions." With respect to this assertion, we find no evidence in the record that Erenwert made any "negligent misrepresentations or omissions" to Boyanton at the time Boyanton signed the sublease on January 16, 2016. Boyanton testified that Erenwert and Alise directed Boyanton to negotiate the sublease, and according to Boyanton, about three weeks before Boyanton signed the sublease with Sunrise Fresh, Erenwert told him "he was on board" when they discussed the lease at that time. But there is no evidence in the record that these statements and actions constituted "misrepresentations" at the time they occurred or when Boyanton signed the sublease.

30

¶60.    We recognize that Erenwert testified that he had some doubts about the warehouse with respect to food-safety issues after his first visit, but he also testified that he "kept the window of opportunity open to just keep looking at things" after that visit. Just two days before Boyanton signed the sublease, Erenwert asked Alise about the cost breakdown in the sublease, which we find constitutes additional evidence that Erenwert was still considering the possibility of Gulf Coast Brothers leasing one-third of the warehouse at the time Boyanton signed the sublease with Sunrise Fresh two days later.

¶61.    Nor do we find that Boyanton has an actionable negligent-misrepresentation claim to the extent he asserts that there exists genuine issues of material fact whether Erenwert negligently misrepresented to Boyanton that he was still interested in Gulf Coast Brothers leasing one-third of the Picayune warehouse after Boyanton signed the sublease and before Governale told Boyanton that Erenwert, Brothers Produce, the Alises, and Gulf Coast Produce were no longer interested in pursuing discussions. Boyanton testified that as late as June or early July 2016 he asked Erenwert, "[W]hat's going on, when are we going to get this thing started[?]" According to Boyanton, Erenwert replied, "[W]ell, I'm waiting for Mike [(Alise)] to get the numbers, that's all I'm waiting for and we're good to go." Even if this statement is sufficient to create an inference that Erenwert intended to go forward with Gulf Coast Brothers entering into the sub-sublease, it is no more than a promise of future conduct, which, as we have recognized above, is insufficient to support a negligent misrepresentation claim. *Spragins*, 605 So. 2d at 780; *Bank of Shaw*, 573 So. 2d at 1360.

31

¶62.   Because Boyanton has failed to put on any evidence that Erenwert made any "misrepresentations" to him regarding the sublease at the time Boyanton executed it on January 16, 2016, and because Boyanton's negligent misrepresentation claim is based upon alleged promises of future conduct even after Boyanton signed the sublease, we find that the circuit court properly granted summary judgment in Erenwert and Brothers Produce's favor on Boyanton's negligent misrepresentation claim.

### B.    Fraudulent Misrepresentation[5]

¶63.   As long-recognized under Mississippi law, Boyanton, as the party claiming fraudulent misrepresentation, must prove each of the following elements by clear and convincing evidence:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of the truth; (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

*Spragins*, 605 So. 2d at 780.  In the summary judgment context, "If [Boyanton] failed to put on sufficient evidence to create an issue of fact for the jury as to any of the above elements, then the issue of fraudulent misrepresentation was correctly excluded from the jury." *Id.* at

---

[5] Boyanton did not plead a fraudulent misrepresentation cause of action in his complaint.  We recognize that Boyanton raised this claim in his responses to the defendants' motions for summary judgment and that the circuit court addressed Boyanton's negligent and fraudulent claims together, finding that neither claim was actionable under Mississippi law.  Although Erenwert and Brothers Produce asserted that the fraudulent misrepresentation claim was not properly before the circuit court in their reply brief, they did not move to strike it or obtain a ruling on their objection.  We therefore address it here.

32

780-81.

¶64. Without pointing to specific facts in the record demonstrating fraudulent intent, Boyanton asserts that genuine issues of material fact exist regarding his fraudulent misrepresentation claim. Based upon our review of the record, however, and for the same reasons discussed above regarding Boyanton's Picayune joint venture claim, we find no evidence at all of fraudulent misrepresentations or actions by Erenwert on Brothers Produce's behalf regarding the formation or continuation of a joint venture among Farmer Fresh Cuts, Farmer Fresh, and Gulf Coast Brothers.

¶65. Additionally, for the same reasons we have discussed with respect to Boyanton's sublease negligent-misrepresentation claim, we likewise find no evidence in the record to support a fraudulent misrepresentation claim with respect to any statements or actions by Erenwert in connection with Boyanton executing the sublease.

¶66. Further, we do not find any evidence supporting a fraudulent misrepresentation claim with respect to any statements or action taken by Erenwert after Boyanton signed the sublease. We recognize that in contrast to negligent misrepresentations, "[f]raudulent representations upon which a party may predicate any demand for relief must relate to past or presently existing facts, as facts, and cannot consist of promises, *except in some cases when a contractual promise is made with the present undisclosed intention of not performing it.*" *Bank of Shaw*, 573 So. 2d at 1360 (emphasis added). However, even if Erenwert told Boyanton in late June or early July he would be "good to go" once he received some numbers

33

from Alise, as Boyanton asserts, we do not find that this statement constitutes a "contractual promise" that Gulf Coast Brothers intended to move forward on the sub-sublease, *id.*, particularly when there is no evidence in the record that Erenwert was authorized to speak on Gulf Coast Produce's behalf, which was the other entity involved in the proposed Gulf Coast Brothers joint venture.

¶67. We recognize that Erenwert testified that sometime during or after March 2016, he decided he did not want to use the Picayune warehouse for food safety reasons, but he continued to have discussions with Alise about Gulf Coast Brothers. As late as June 2016, text messages in the record indicate that they were still looking for investors. Moreover, the record reflects that both Erenwert and the Alises had concerns about obtaining Louisiana casino business because the warehouse was located in Mississippi. These casino licensing concerns were still being discussed between Alise and Erenwert as late as June 21, 2016, as reflected in an email between them on that date. In that email Erenwert stated:

> We are going to have to look at New Orleans path for the sake of labor, money, operations[,] and most importantly the casino license aspect. As good of a deal [Boyanton's] building is the licensing aspect alone hurts it. We should probably tell him sooner than later I'm thinking so he doesn't miss any opportunities to lease it out, but I think it's imperative we are in Louisiana.

Thus, in the light of the circumstances, we do not find that Erenwert's statement that "we're good to go" rises to the level of fraudulent intent to deceive Boyanton, particularly where this assertion must ultimately be proven by clear-and-convincing evidence. *See Mayer*, 83 So.

34

3d at 449 (¶12).[6]  In sum, we find that the circuit court properly granted summary judgment in Erenwert and Brothers Produce's favor on Boyanton's fraudulent misrepresentation claim.

¶68.  **AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR.  WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

---

[6] As this Court recognized in *Mayer*, "[a] party opposing summary judgment is entitled to all reasonable inferences from the evidence. . . . *However, the evidence must remove the case from the realm of conjecture and place it within the field of legitimate inference*." *Mayer*, 83 So. 3d at 449 (¶12) (emphasis added) (citations and internal quotation mark omitted).  Continuing, this Court found that "[t]his is particularly true when the inference is offered to support a claim of fraud, which must be proven by clear-and-convincing evidence." *Id.*  We find that the same analysis is applicable here.